## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **DREXEL ON THE PARK, LLC,** an Oklahoma limited liability company; **JOHN ANTONELLI;** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **STATEWIDE RENOVATION AND SUPPLIES, INC.,** an Oklahoma Corporation, <br><br> **Defendant and Consolidated Plaintiff,** <br><br> **v.** <br><br> **DREXEL ON THE PARK, LLC,** and **VANGUARD PROPERTIES, LLC,** <br><br> **Consolidated Defendants.** | **Case No. CIV-15-1257-R** |

## <u>ORDER</u>

Six motions are pending before the Court. Having considered the parties' briefs, the Court

- DENIES Defendant's Motions to Dismiss for Lack of Jurisdiction. (Docs. 123 & 124).

- GRANTS Plaintiff Antonelli's Motion to Dismiss Claims against Defendant with Prejudice. (Doc. 127).

- GRANTS IN PART AND DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment. (Doc. 97).

1

- DENIES Defendant's Motion for Summary Judgment. (Doc. 100).

- DENIES Plaintiff's Motion for Reconsideration of the Court's Previous Order. (Doc. 99).

## I. Background

### A. Hail Damage and the Insurance Settlement

This case concerns a sale of real estate that was allegedly disrupted in November 2015 by the actions of Defendant Statewide Renovations and Supplies, Inc. ("Statewide"). The events that led to this lawsuit, though, actually began much earlier, in May 2012. It was then that the Oklahoma City apartment complex owned by Plaintiff Drexel on the Park, LLC, ("Drexel") suffered serious storm and hail damage. Drexel was at the time part of a series of limited liability companies controlled by two individuals, John Antonelli and Mike Soraya. Soraya contracted with Statewide, in particular its president, sole shareholder and director Cooper Smith, to serve as a claim adjuster for the storm damage. Soraya would eventually contract Statewide to perform the repair work on the Drexel Apartments.

Sometime in 2012, the insurance claim on the damage to the Drexel Apartments was settled for $684,015.29. Drexel's Insurer paid these funds to Drexel and Berkeley Point Capital, LLC, the servicing company for Drexel's mortgage lender, Fannie Mae. Berkeley Point and Drexel then entered into an Insurance Loss Proceeds Collateral Agreement (the "Insurance Proceeds Agreement") to hold those insurance funds in escrow for the purpose of repairing the Apartments. Soraya then sent the Agreement to Cooper Smith at Statewide on August 26, 2013, assuring him that Statewide would be

paid the full price of the contract—$684,015.29—from the money in that escrow account. (Doc. 98, Ex. 19).

But nearly a year later, Statewide was yet to be paid what it believed it was owed for the construction and roofing work it had performed on the Drexel Apartments. Drexel had in fact paid a portion of the balance; its in-house-repair and property-inspection company, Vanguard Properties, LLC,[1] had payed Statewide twice in the amounts of $203,005.09 and $228,005.10. Yet Statewide still believed it was owed the storm contract balance of $253,005.10.

## B. The Expired Lien and the Ownership Dispute

So on June 12, 2014, Statewide filed a mechanic's and materialmen's lien against title to the Apartments. Unfortunately for Statewide, merely filing the lien was the sole action it took to recover the money it believed it was owed. As a result, one year later— when Statewide had still neglected to take any action to foreclose or adjudicate the lien— the lien expired by the terms of Oklahoma statute.[2] Drexel then filed its Affidavit of Cancellation of the lien on July 9, 2015. And with that, Statewide allegedly squandered its valid lien against title to the Apartments.

Meanwhile, prior to the lien expiring, an ownership battle between Soraya and Mr. Antonelli over their several LLCs had come to a head. By early April 2015, the two had at least partially settled their dispute—with the Drexel Apartments winding up in the

---

[1] Like Drexel, Vanguard has as its sole member the trust interests of John Antonelli.
[2] Okla. Stat. Ann. tit. 42, § 177 explains that "if no action to foreclose or adjudicate any lien filed under the provisions of this chapter shall be instituted within one (1) year from the filing of said lien, the lien is canceled by limitation of law. If a lien is canceled by limitation of law, the owner of the land may file an affidavit attesting to the cancellation with the county clerk of the county in which the land is located."

hands of Mr. Antonelli, or rather the Antonelli Trust of which he is the trustee and sole beneficiary. (Doc. 98, Ex. 1, at 1). Statewide maintains it was left in a precarious position; its business dealings with Drexel had always been through Soraya, not Mr. Antonelli. For better or worse, Statewide resolved to continue to take directions from Soraya. One of those directives was apparently not to foreclose on the (at the time) still valid lien it had filed against the Drexel Apartments. Soraya worried that foreclosure would have triggered a default by Drexel on its mortgage with Fannie Mae and would have invoked Mr. Antonelli's personal guarantee on the mortgage—further complicating the then simmering ownership war being waged between Mr. Antonelli and Soraya. Statewide acquiesced: the lien was not foreclosed. Mr. Smith would later acknowledge that he understood his lien would expire and simply passed on foreclosing on it at the behest of Soraya. (Doc. 98, Ex. 2, at 66).

## C. The Delayed Real Estate Transaction

By late 2015, Mr. Antonelli was looking to unload the Apartments. Drexel thus entered into a Real Estate Purchase Contract on August 21, 2015, to sell the Apartments to Desert Crest, LLC, for $5,500,000. Closure was scheduled for early November 2015, but before that could take place, Drexel was required to deliver to Desert Crest a current title commitment from its title company, Oklahoma City Title and Abstract Company ("OKC Title"), showing that title to the Apartments was good and marketable in accordance with Oklahoma title standards. Naturally, Desert Crest needed a showing of good title; its lender had agreed to finance part of the purchase price, secured by a

mortgage, only if OKC Title first issued a title policy guaranteeing the validity and priority of the mortgage.

Drexel alleges it was about to close on the sale on November 5, 2015, when Statewide filed suit in state court in Cleveland County, Oklahoma. The Petition alleged, among other things, that Drexel still owed Statewide for the roofing work and that the insurance funds—the money being held in escrow pursuant to Berkeley Point's and Drexel's Insurance Proceeds Agreement—were actually being held in escrow or trust for Statewide's benefit. Smith, anxious that his company would never be paid for its construction services if the sale went through, authorized Statewide's counsel to send a letter to Desert Crest, Desert Crest's lender, and OKC Title, alerting them to Statewide's claims against Drexel. The letter provided in part that:

> Statewide asserts that its claims will compete with the new owner and any new lending to be put in place on the property. Based on Oklahoma lien statutes, and the precedent of Thomas v. Hoge, 58 Kan. 166, 48 P. 844 (Kan. 1897), Statewide believes that its claim will take priority over any new mortgage liens that may be put in place in connection with the purchase.
>
> We respectfully refer your attention to the information shared in this letter and ask that the appropriate parties take into consideration the claims of Statewide in proceeding with the purchase transaction unless and until the Statewide claims are paid or otherwise adequately addressed.

(Doc. 98, Ex. 3).

The letter also asserted that Statewide was due more than $300,000 in unpaid balances from Drexel.

OKC Title responded by amending the outstanding title commitment to include an additional requirement that Statewide's state court action be resolved before the sale between Drexel and Desert Crest could proceed. (Doc. 98, Ex. 8, at 4). As explained by Mr. Smith, he had to act because he "had wind that the property was going to be sold, and I wanted them—the parties involved to know that there's still a debt remaining attached to the—on those properties for the repairs that we had made." (Doc. 98, Ex. 2, at 75). The sale was thus his "opportunity to leverage collection of [the] debt" because "if everybody [was] going to get paid," Smith believed he should too. (*Id*. at 78 – 81). In other words, Smith was alerting Desert Crest, its lender, and OKC Title that his claims would take priority over any new mortgage on the Drexel Apartments. (*Id*. at 218).

Statewide tried to bargain; it agreed to withdraw its state court litigation should Drexel immediately compensate it for the roofing work by paying it $153,000 plus all other amounts held in escrow pursuant to the Insurance Proceeds Agreement between Drexel and Berkeley Point. (*Id*. at 86). Drexel did not consent to that. But hoping to induce OKC Title to withdraw the condition concerning the resolution of the state court action, it agreed to something else: Mr. Antonelli and Drexel would enter into an Indemnity and Escrow agreement with OKC Title. That deal, finalized on November 17, 2015, called for Mr. Antonelli to personally indemnify OKC Title against any future Statewide claims and for $350,000 of the proceeds from the sale of the Drexel Apartments to be placed in escrow with OKC Title. The parties agreed, and the sale went forward the same day. (Doc. 98, Ex. 1, at 1).

**D. Procedural Posture**

Drexel filed suit in this Court on November 13, 2015, still prior to the sale. In addition to its substantive claims, Drexel originally sought declaratory and injunctive relief requiring Statewide to withdraw its claims against title to the Drexel Apartments and/or declaratory relief determining that the claims of Statewide did not constitute valid claims against title to the Apartments. An emergency hearing was scheduled for November 18, 2015, but after the sale closed on November 17, the need for emergency relief was no longer required and the hearing was cancelled. Yet Drexel's claims for abuse of process, slander of title, and intentional interference with contractual relations still remained. Shortly after, Statewide's state court action was removed to this Court and consolidated with this case. (Docs. 1 & 16). Further, the reserves that Drexel placed with Berkeley Point pursuant to the note and mortgage (the "Drexel Reserves") and the insurance funds were transferred to the Clerk Court by way of this Court's Order (Doc. 19).

So as it stands today, the Court must resolve several issues. Drexel's original substantive claims still remain, and it appears Statewide is asserting several claims, including breach of contract. But for purposes of this Order, the relevant ones are against Drexel and Antonelli for breach of fiduciary duties and a claim for "trust nature of funds." That claim essentially asserts that the insurance funds and Drexel Reserves, now on deposit with the Clerk, belong to Statewide. Both parties have moved for summary judgment on each of these claims. (Docs. 97 & 100). Drexel also asks this Court to reconsider its earlier Order (Doc. 40) denying the disbursement of the deposit funds to Drexel. Finally, Statewide has moved to dismiss the claims of Drexel and Mr. Antonelli

for lack of subject matter jurisdiction. (Docs. 123 & 124). The Court first addresses these latter two motions.

### II. Statewide's Motions to Dismiss for Lack of Subject Matter Jurisdiction

Contending that both Drexel's and Mr. Antonelli's claims fail to meet the amount in controversy requirement necessary to invoke this Court's jurisdiction under 28 U.S.C. § 1332, Statewide has moved to dismiss all claims asserted by Drexel and Mr. Antonelli. For the following reasons, the Court denies both motions.

"The district courts of the United States, as we have said many times, are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552, 125 S. Ct. 2611, 2616 (2005) (internal quotations omitted). "In order to provide a neutral forum for what have come to be known as diversity cases, Congress also has granted district courts original jurisdiction in civil actions between citizens of different States, between U.S. citizens and foreign citizens, or by foreign states against U.S. citizens." *Id.* As this case comes before the Court on the basis of diversity jurisdiction, 28 U.S.C. § 1332 precludes this Court from exercising jurisdiction if the amount in controversy does not exceed the sum of $75,000. "It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S. Ct. 586, 590 (1938).

### A. Diversity jurisdiction is proper over Drexel's claims.

Statewide lists two reasons that the amount in controversy involving Drexel's claims does not exceed $75,000, thereby depriving this Court of jurisdiction. First, it

insists, based on statements made by Mr. Antonelli in discovery, that Drexel is only seeking actual damages of $54,537 against Statewide. Second, while it acknowledges that punitive damages are pertinent to assessing the amount in controversy, Statewide argues Drexel's claims for punitive damages may not be considered since they are not brought in good faith. Neither argument persuades. Jurisdiction is proper.

For one, the amount in controversy is determined at the time of filing. *See Grupo Dataflux*, 124 S.Ct. 1920, 1924, 541 U.S. 570, 570–571 (2004) ("It has long been the case that 'the jurisdiction of the court depends upon the state of things at the time of the action brought.'") (quoting *Mollan v. Torrance*, 9 Wheat 537, 539, 6 L.Ed. 154 (1824)); *see also Watson v. Blankinship*, 20 F.3d 383, 387 (10th Cir. 1994) (noting that "the amount in controversy requirement is determined at the time the complaint was filed"). This action originally sought emergency injunctive relief and/or declaratory relief concerning the Statewide claims in order to allow the sale of the Drexel Apartments to go forward for $5,500,000. Though the sale eventually went forward, the proposed sale price is not irrelevant in determining the amount in controversy: "[i]n actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation." *Hunt v. Wash. State Apple Advert Com'n*, 432 U.S. 333, 347 (1977). The original, if not the primary object of Drexel's suit, was declaratory and injunctive relief permitting the sale to go forward. With a sale price of $5.5 million, the amount in controversy is sufficient.

But even if injunctive relief had not been sought—theoretically making the sale price immaterial—the amount in controversy would still be met because the current

aggregate of Drexel's claims exceeds $75,000. Granted, it does so by considering punitive damages, but that is not improper. Statewide is doubtless correct that punitive damages can be considered "in determining whether the jurisdictional amount has been satisfied." *Flowers v. EZPawn Oklahoma, Inc.*, 307 F. Supp. 2d 1191, 1198 (W.D. Okla. 2004). It insists, however, that the amount of punitive damages sought may only be considered when pled in good faith, citing *Racich v. Mid Continent Builders Co.*, 755 F. Supp. 228, 229 (N.D. Ill. 1991). But for the reasons discussed below in the context of the parties' summary judgment motions, there is no reason to think Drexel's claims are not asserted in good faith or that Drexel could not potentially recover punitive damages; Oklahoma classifies the amount of punitive damages available according to the egregiousness of the defendant's conduct. Consequently, even the most easily satisfied tier will permit Drexel to recover an amount equal to that of actual damages so long as it shows "reckless disregard" on the part of Statewide. Okla. Stat. Ann. tit. 23, § 9.1. Put differently, even if Drexel is only claiming $54,537 in actual damages as Statewide asserts, then with punitive damages, the claims aggregate to $109,074. With Statewide having failed to prove to a legal certainty that the sum of Drexel's claims does not exceed $75,000, this Court must assume jurisdiction over Drexel's claims. Statewide's Motion to Dismiss Drexel's Claims is therefore denied.

**B. Statewide's Motion to Dismiss Mr. Antonelli's Claims is denied as moot.**

Statewide has also moved to dismiss the claims of Mr. Antonelli. (Doc. 123). That motion is denied as moot; Mr. Antonelli has moved to dismiss his claims against Statewide with prejudice (Doc. 127). Because it came to light during discovery that the

sole member of Drexel is not Mr. Antonelli but a trust of which Mr. Antonelli is the trustee and beneficiary, Mr. Antonelli believes he has not suffered any damages personally and asks this Court to dismiss his claims.

With Statewide having already served an answer and moved for summary judgment, Federal Rule of Civil Procedure 41(a)(1) allows voluntarily dismissal without a court order only by stipulation of all parties. Statewide has not agreed to that. Rule 41(a)(2), however, allows an action to be dismissed at the request of the plaintiff by court order on terms that the court considers proper. The Court finds that dismissal with prejudice is proper in this instance. Dismissal in no way affects Statewide's claims, which remain pending before this Court. Further, Statewide has not been prejudiced by defending against the additional claims of Mr. Antonelli. As trustee and beneficiary of the sole member of Drexel, he has asserted identical claims to those of Drexel.

As for the attorney's fees sought by Statewide, they are not warranted here. The Tenth Circuit "continue[s] to adhere to the rule that a defendant may not recover attorneys' fees when a plaintiff dismissed an action with prejudice absent exceptional circumstances." *AeroTech, Inc. v. Estes*, 110 F.3d 1523, 1528 (10th Cir. 1997). Mr. Antonelli's claims are therefore dismissed with prejudice. Statewide's Motion to Dismiss Mr. Antonelli's claims is thus denied as moot.

### III. Summary Judgment Motions

Both parties have moved for summary judgment on their substantive claims. Drexel seeks judgment on the issue of Statewide's liability for abuse of process, slander

of title, and intentional interference with contractual relations.[3] It also asks this Court to enter judgment determining that Drexel and Mr. Antonelli have no liability to Statewide for breach of fiduciary duties and that Statewide has no enforceable claim to the Insurance Funds and Drexel Reserves. Statewide has also moved for summary judgment on the same claims. In addition to its seeking judgment from this Court that it is not liable to Drexel for abuse of process, slander of title, or intentional interference with contractual relations, Statewide requests a determination from this Court that Mr. Antonelli and Drexel are liable to it for breach of fiduciary duties and that it does in fact have an enforceable claim to the Insurance Funds and Drexel Reserves.

## A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the non-movant must "do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986) (citations omitted). The non-movant may do so by: "(A) citing to particular parts of materials in the record . . . or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The parties need not negate each other's claims nor disprove their

---

[3] Drexel leaves the issue of actual and punitive damages for trial.

evidence, but each party does have the burden to show that there is no evidence in the record to support the non-movant's claims. *Celotex v. Catrett*, 477 U.S. 317, 325 (1986). "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way . . . An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir. 1998) (citations omitted). In short, the Court must inquire "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986). While all facts and reasonable inferences therefrom are construed in the light most favorable to the non-moving party, *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 712–713 (10th Cir. 2014), "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [non-movant]." *Anderson*, 477 U.S. 252. At the summary judgment stage, the Court's role is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

**B.      Drexel's Abuse of Process Claim**

Drexel maintains that Statewide's filing of its state court action constituted an abuse of process in that it was meant solely to disrupt the sale of the Apartments.[4] To prove a claim for abuse of process, a plaintiff must show: "(1) the improper use of the court's process (2) primarily for an ulterior or improper purpose (3) with resulting damage to the plaintiff asserting the misuse." *Callaway v. Parkwood Village, LLC*, 1 P.3d 1003, 1004 (Okla. 2000). The Tenth Circuit has characterized an abuse of process claim under Oklahoma law as occurring "when legal process is used for an improper purpose, to accomplish an end not lawfully obtainable, or to compel someone to do some collateral thing he could not legally be compelled to do." *Houghton v. Foremost Financial Servs. Corp.*, 724 F.2d 112, 116 (10th Cir. 1983).  This is not to say that a person who initiates suit with less than honorable intentions is necessary liable for abuse of process: "Although a plaintiff in a predicate action may have been motivated by bad intention, there is no abuse if the court's process is used legitimately to its authorized conclusion." *Greenberg v. Wolfberg*, 890 P.2d 895, 905 (Okla. 1994).

The Court finds that summary judgment is appropriate for neither party. Statewide has at the very least put forth a genuine issue of fact as to whether it was acting with an ulterior or improper purpose. It has always maintained that its suit in state court was filed first and foremost to collect on the money it believed it was still owed for the earlier work it had done on the Drexel Apartments. That is more or less the basis of its Petition, which

---

[4] Drexel's briefs also seem to suggest that Statewide's sending of the letter constituted an abuse of process. That cannot be, however, since the letter did not involve any process of this Court or the state court.

14

asserts claims for breach of contract and fiduciary duties resulting from Drexel's alleged failure to pay Statewide the full cost of the repair work it had performed. (Doc. 48). On the other hand, Drexel has put forth sufficient evidence to avoid summary judgment on its abuse of process claim as well: it cites Mr. Smith's own admission that the reason he initiated the lawsuit was in order to collect on the unpaid invoices owed to Statewide. As Smith confessed, he was in "panic mode," and filing suit was his "opportunity to leverage collection of [the] debt" because "if everybody [was] going to get paid, I should certainly be in line to get paid." (Doc. 98, Ex. 2, at 78 – 81). But simply put, his opportunity to be paid involved disrupting the sale. And the timing of the suit was suspicious. If Statewide's actual objective was to recover the funds it believed it was owed by Drexel, it is not clear why it did not do so in the months leading up to the real estate sale. Soraya might have requested Statewide not foreclose on its lien, but nothing prevented Statewide from bringing suit for breach of contract. As for the third element—damage sustained from the misuse—that too is met. Drexel was required to enter into an Indemnity and Escrow Agreement with OKC Title under which $350,000 of the proceeds from the sale were placed in escrow. Summary judgment on Drexel's abuse of process claim is therefore warranted for neither Drexel nor Statewide.

## C. Drexel's Slander of Title Claim

As with its abuse of process claim, Drexel's claim for slander of title faces cross motions for summary judgment. Again, summary judgment is inappropriate for both parties.

Under Oklahoma law, "[t]he elements of slander of title include: (1) publication; (2) a false statement in the publication; (3) malice in the publication; (4) special damage resulting from the publication, and (5) ownership or possession of the property that is the subject of the publication." *Grasz v. Discover Bank ex rel SA Discover Fin. Servs., Inc.*, 315 P.3d 406, 409 (Okla. Civ. App. 2013).

Three of these elements are clearly present. The letter to Desert Crest, its lender, and OKC Title constituted a publication.[5] Ownership or possession of the property referenced in the letter is not in question; Drexel owned the Apartments. Special damage is obvious; Drexel incurred attorneys' fees in negotiating with OKC Title to allow the sale to proceed and was deprived of $350,000 of the sale proceeds per the terms of the escrow agreement. As for falsehood, the Court is unpersuaded by Statewide's argument that it is somehow protected against suit for slander of title because it was merely asserting its opinion that it was in compliance with Oklahoma lien laws. Statewide cannot immunize itself from suit merely by couching its statements of fact in the form of an opinion. The opposite conclusion "would be destructive of the law of libel [as] a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990) (internal quotations omitted). This Court has previously acknowledged as much: "if an opinion is expressed without disclosing the underlying factual basis for the opinion, the opinion is actionable under Oklahoma law if the opinion implies or creates a

---

[5] And the fact that it concerned pending litigation does not rebrand the letter as privileged. *See Kleier Advert., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1043 – 1044 (10th Cir. 1990) (explaining that privilege does not cover "publication to those wholly unconnected with the judicial process").

reasonable inference that the opinion is justified by the existence of undisclosed . . . facts." *Metcalf v. KFOR-TV, Inc.*, 828 F.Supp. 1515, 1529 (W.D. Okla. 1992). Consider what Desert Crest, its lender, or OKC Title would have understood from the letter's declaration that "[b]ased on the Oklahoma lien statutes, and the precedent of <u>Thomas v. Hoge</u> . . . [Statewide] believes that its claims will take priority over any new mortgage liens that may be put in place in connection with the purchase." (Doc. 98, Ex. 3). Statewide's matter-of-factness creates a reasonable inference in the reader that its position—that is has a lien that will defeat any new mortgage on the property—is rooted in legal fact.

That position, though, is in no way certain and is legally dubious at best. Statewide was required to take action on its lien within a year of filing or risk "the lien [being] cancelled by limitation of law." Okla. Stat. tit. 42, § 177. This was neither a secret nor a surprise to Mr. Smith: he readily admits that his decision not to foreclose on his lien was for the purpose of placating Soraya. There appear to be two ways in which Statewide could have obtained a valid lien against title to the Apartments. This first is of course by timely filing and prosecuting a mechanic's and materialman's lien in compliance with Oklahoma's lien laws, Okla. Stat. Ann. tit. 42, § 141. The second is by obtaining judgment against Drexel and complying with the applicable statutes for recording the judgment as a judgment lien against real property. Okla. Stat. Ann. tit. 12, § 706. Statewide did neither.

Further, its reference of *Thomas v. Hoge*, 48 P. 844 (Kan. 1897), in its letter neither cures that omission nor renders its declaration truthful. Ignore for a moment that

*Thomas* is a century-old case from a foreign jurisdiction; that Oklahoma courts are under no obligation to follow it and indeed by all accounts have yet to adopt it; and that the Supreme Court of Kansas itself would later characterize *Thomas* as a "questionable" and describe it as "appear[ing] to conflict with" earlier precedent.[6] *Thomas*'s holding—that the one-year statute of limitations for enforcing a mechanic's lien applies only when enforcing it against the landowner and not the mortgagee[7]—seems somewhat irrelevant considering Oklahoma's statute commands state courts, and by extension this Court, to hold to the contrary.

Statewide also makes the argument that Drexel is somehow estopped from arguing that Statewide made a claim to title on the Apartments because, in the flurry of emails sent to OKC Title in the days following Statewide's letter and lawsuit, Drexel's counsel sought to assure OKC Title that Statewide's actions did not actually affect title to the Apartments. Drexel's counsel was unsurprisingly working to push through the real estate deal. His representations, though, do not preclude Drexel's slander of title claim or others. For one, "[a]n indispensable element of judicial estoppel is that the party taking the inconsistent position must have been successful in maintaining its prior factual position." *Barringer v. Baptist Healthcare of Oklahoma*, 22 P.3d 695, 700 (Okla. 2001). This means Drexel must have "received some clear benefit or unfair advantage from maintaining its prior factual assertion in the same proceeding or a previous one." *Id*. The problem is that Drexel received neither: OKC Title only removed the condition that the

---

[6] *Bell v. Hernandez*, 30 P.2d 1101, 1104, 1106 (Kan. 1934).
[7] *Thomas*, 48 P. at 846.

Statewide proceedings be resolved after Drexel and Mr. Antonelli agreed to enter into an agreement under which Mr. Antonelli personally indemnified OKC Title and $350,000 of the sale proceeds were placed in escrow. Further, one of the elements of equitable estoppel is that "the person to whom it was made acted in reliance upon it to his detriment." *Rouse v. Oklahoma Merit Protection Commission*, 345 P.3d 366, 376 n.20 (Okla. 2015). As there is no evidence Statewide knew of these emails or relied upon them, estoppel is inappropriate.

The dispositive issue for the slander claim, as with the abuse of process claim, comes down to the impropriety of Statewide's actions. It is true that courts have acknowledged that malice for slander of title purposes is not necessarily evil intent, but rather "a lack of good faith and a want of probable cause." *Voiles v. Santa Fe Minerals, Inc.*, 911 P.2d 1205, 1209 – 1210 (Okla. 1996); *also see Hamilton v. Amwar Petroleum Co., Inc.*, 769 P.2d 146, 149 (Okla. 1989) ("malice as the term is used in an action for slander of title in this jurisdiction encompasses lack of good faith and probable cause"). As explained above, Statewide's contention that its lien had priority is no sure thing. Indeed, it is likely wrong. But whether that assertion was made in bad faith is a question better left for trial.

## D. Drexel's Claim for Intentional Interference with Contractual Relations

The last of Drexel's claims asserts an intentional interference with contractual relations on the basis of both Statewide's filing of the state court action and the sending of the letter. Both parties have moved for summary judgment on that claim. Once more, the Court denies both motions.

"Oklahoma recognizes a tortious interference claim with a contractual or business relationship if the plaintiff can prove (1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable, and (4) the interference proximately caused damage." *Wilspec Technologies, Inc. v. DunAn Holding Group, Co., Ltd.*, 204 P.3d 69, 74 (Okla. 2009). Two of these elements are easily met. Drexel surely had an existing contractual right: it was set to close on its real estate contract on November 5, 2015; likewise, Statewide's actions caused at least some proximate damage: the closing was temporarily delayed until November 17, 2015—and only after OKC Title agreed to issue the title policy and its escrow agreement with Drexel was in place. Further, Drexel is currently deprived of the funds on deposit with the Clerk.

Not surprisingly, the dispute is whether Statewide's actions were wrongful and unjustified to a degree to warrant liability for interference with the contract. While Drexel must prove maliciousness and impropriety by Statewide, that does not equate to "personal hatred, ill will, or spite." *Id.* at n.5. So for the same reasons summary judgment is appropriate for neither party on the abuse of process and slander of title claim, the Court denies summary judgment on the contractual interference claim.

### E. Statewide's Claims against Drexel and Mr. Antonelli for Breaches of Fiduciary Duty

The Court turns to Statewide's claims against Drexel and Mr. Antonelli for allegedly breaching their fiduciary duties by failing to pay the money owed on the storm contract. All parties have moved for summary judgment on those claims as well.

The Court finds that summary judgment in favor of Drexel and Mr. Antonelli is appropriate: Statewide offers no evidence or authority suggesting that either Drexel or Mr. Antonelli owed Statewide a fiduciary duty. It comes as no surprise that without the existence of a fiduciary relationship, a plaintiff cannot recover on a breach of fiduciary duty. *Graves v. Johnson*, 359 P.3d 1151, 1155 (Okla. Civ. App. 2015). Here, that would require Statewide to prove that either Drexel or Mr. Antonelli obtained an inordinate amount of influence over it such that Statewide was substituting its own judgment for that of Drexel's or Mr. Antonelli's. *See Horton v. Hamilton*, 345 P.3d 357, 364 (Okla. 2015) (clarifying that a fiduciary relationship exists "when one person acquires influence over another such that the influenced allows the influencer to substitute his or her will for the influenced's own"). The problem with Statewide's contention is that "[u]nder Oklahoma law, parties to arms-length commercial transactions do not owe each other fiduciary duties." *Roberts v. American Medical Sec., Inc.*, 2012 WL 2126947, at *12 (N.D. Okla. Jun. 11, 2012).

Starting first with Mr. Antonelli's relationship with Statewide, to the extent there was one at all, it is not clear how it could be fiduciary in nature given Mr. Smith's admission that he never dealt with Mr. Antonelli when contracting work for Statewide. And while Drexel surely had some sort of relationship with Statewide, it was not fiduciary. The parties' original disagreement is rather straightforward: Drexel contracted Statewide to perform work on the Apartments; Statewide believes it fulfilled its obligations and should be paid; and Drexel now denies the work was done properly and refuses to pay. The relationship is contractual. And in the absence of a fiduciary duty,

Oklahoma law expressly precludes Mr. Antonelli from being personally liable for Drexel's obligations to its creditors. Okla. Stat. Ann. tit. 18, § 2022.[8]

Still, Statewide maintains that Mr. Antonelli's and Drexel's "level of control," particularly that Drexel's corporate office intercepted a check payable to Drexel and Statewide yet returned that money to Berkeley Point, along with Drexel's "ability to totally deprive Statewide of funds," rises to the level of fiduciary duty. Statewide warns of a parade of horribles: were this Court not to find a fiduciary duty here, it argues, then it will be hard pressed to find a fiduciary duty anywhere else. This is essentially the same argument that the District Court rejected in *Roberts*, where independent contractors who sold insurance policies for an insurance company sued the company for failure to pay their contracts. *Roberts*, WL 2126947, at *12. The court granted summary judgment to the defendants because the "plaintiffs ha[d] presented no evidence of any relationship other than a strictly contractual one." *Id. Roberts* relied on the Tenth Circuit's holding in *Dodd Ins. Services, Inc. v. Royal Ins. Co.*, 935 F.2d 1152 (10th Cir. 1991). Similar to *Roberts*, the *Dodd* plaintiffs ran an independently owned insurance agency, sold policies for the defendant, and argued a fiduciary relationship must exist because plaintiffs "came to repose trust and confidence in [defendant]." *Id*. at 1156. The Court disagreed—the parties had a "strictly contractual relationship." *Id*. at 1157.

Here, Statewide may have a valid claim for breach of contract. But it does not have one for breach of fiduciary duty.

---

[8] "A person who is a member or manager, or both, of a limited liability company is not liable for the obligations of a limited liability company solely by reason of being such member or manager or both." Okla. Stat. Ann. tit. 18, § 2022.

**F. Statewide's Trust-Nature-of-Funds Claim**

Finally, the Court takes up the nature of the funds that are currently on deposit with the Court Clerk. Statewide's Petition asserts a claim entitled "Trust Nature of Funds" in which it alleges that the funds currently on deposit with the Clerk "were held in trust, escrow, or other relationship of confidence by Berkeley for the benefit of Statewide." (Doc. 48, at 36). Those funds are in the amount of $208,001.10 and originally consisted of proceeds from the sale of the Drexel apartments, along with the leftover insurance claim proceeds that were held by Berkeley Point pursuant to the Escrow Agreement for the benefit of Drexel's mortgagee, Fannie Mae. These funds are of particular concern because, in addition to the Berkeley Point/Fannie Mae mortgage, the Drexel Apartments were subject to a second mortgage. That mortgage was in favor of the Antonelli Trust, which Drexel argues should have been paid the sale proceeds and Drexel Reserves at closing. Statewide maintains that representations of Mr. Soraya to Mr. Smith that the funds were being held in escrow so that Statewide could be paid for its construction work render the money a trust for the benefit of Statewide. It has moved for summary judgment.

Given the email exchange between Soraya and Statewide in which Soraya, on behalf of Drexel, assures Statewide that it will be paid for their repair work from the money in escrow, along with Soraya's testimony (Doc. 28, Ex. 5) that he fully intended for Drexel to pay that money to Statewide, there seems to be a genuine dispute of material fact as to who is entitled to those funds. Summary judgment on Statewide's "trust claim" is therefore denied.

## IV. Drexel's Motion to Reconsider

Drexel, however, urges the Court to reconsider its earlier Order (Doc. 40) denying Drexel's motion to require the disbursement of those funds held on deposit with the Clerk. As explained above, however, there seems to be a reasonable dispute as to who owns those funds. Drexel's Motion to Reconsider is therefore denied.

## V. Conclusion

In sum, the Court finds as follows.

- Drexel's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part. (Doc. 97).

- Statewide's Motion for Summary Judgment is DENIED. (Doc. 100).

- Statewide's Motion to Dismiss the Claims of Mr. Antonelli for Lack of Jurisdiction is DENIED as moot. (Doc. 123).

- Statewide's Motion to Dismiss the Claims of Drexel for Lack of Jurisdiction is DENIED. (Doc. 124).

- Mr. Antonelli's Motion to Dismiss Claims Against Statewide with Prejudice is GRANTED. (Doc. 127).

- Drexel's Motion for Reconsideration is DENIED. (Doc. 99).

IT IS SO ORDERED this 27th day of December 2016.


DAVID L. RUSSELL
UNITED STATES DISTRICT JUDGE